UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NAUTILUS INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:14-cv-01273-MJD-WTL |
| | ) | |
| SUNSET STRIP, INC., | ) | |
| ANDRE  HOLT, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Andre Holt ("Holt") was injured when he was shot in the face while on the premises of

Sunset Strip ("Sunset"), an adult cabaret in Indianapolis, Indiana. Holt filed suit against Sunset in

Indiana state court, and Sunset sought coverage for the suit through an insurance policy issued by

Nautilus Insurance Company ("Nautilus" or "Plaintiff"). Nautilus then filed the current action, in

which Nautilus seeks a declaratory judgment stating that Nautilus has no duty to defend or

indemnify Sunset for any claim arising out Holt's injury. Plaintiff moved for summary judgment

on May 1, 2015, [Dkt. 55], and after reviewing the parties' briefs and the designated evidence,

the Court **GRANTS** Plaintiff's motion.

## I.      Legal Standard

Federal Rule of Civil Procedure 56(a) provides that a court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." The moving party "always bears the initial

responsibility" to show, through the "pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any," that there exists no genuine issue of

1

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the party moving for summary judgment would not bear the burden of proving a certain element of a claim or defense at trial, then the nonmoving party has the burden to prove the existence of that essential element or the existence of a genuine issue of material fact related to that element. *Id.* at 323-24.

In ruling on a motion for summary judgment, the court must construe all evidence in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 601 (1986), and the Court must draw all reasonable factual inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.*, 158 F.3d 966, 968 (7th Cir. 1998). The Court does not make credibility determinations, weigh the evidence, or choose which inference to draw from the facts; instead, these duties are reserved for the factfinder. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When the complete record, as presented in favor of the nonmoving party, could lead no rational juror to find for the nonmoving party, "there is no genuine issue for trial," and summary judgment is therefore appropriate. *Matsushita*, 475 U.S. at 599.

## II.     Factual Background

Sunset Strip, Inc. ("Sunset") is an adult cabaret owned by brothers Tim and John Logan. [Dkt. 56-2 at 1-4 (John Logan Dep., 5:1-7:25, April 22, 2015).] The establishment derives up to 93% of its revenues from liquor sales. [Dkt. 62-4 at 11 (Curtis Chalmers Dep., 81:6-82-20, March 31, 2015.).] The remainder of Sunset's revenue comes from sources such as the sale of food prepared at Sunset's on-site kitchen. [*See* Dkt. 56-2 at 14.]

Sunset also offers live entertainment in the form of nude or semi-nude dancing. [Dkt. 60-1 at 2 (Aff. of John Logan).] Sunset's owner described the dancers as independent contractors who receive compensation not from Sunset itself but from tips from Sunset's patrons. [*Id.*] To increase their compensation, the dancers "seek constant interaction" with each of Sunset's

patrons "in order to gain attention and tips." [*Id.*] The dancers thus "react and alter their performances based on the patrons' decision to provide his/her attention or turn his/her attention away from the performance of a particular dancer." [*Id.*]

John Logan also testified about the history of Sunset's insurance coverage. He stated that Sunset obtained insurance by working with insurance agent Chris Dant. [Dkt. 56-2 at 6.] Mr. Dant explained that he had assisted Sunset with its coverage for approximately 15 years, [Dkt. 56-3 at 22 (Chris Dant Dep., 22:5-9, April 8, 2015)], and that until 2008, Sunset had been covered under a general commercial liability insurance policy issued by USF. [*Id.* at 20.] At that time, Mr. Dant advised Sunset to seek a new insurance carrier for its general commercial liability policy. [Dkt. 60-1 at 3.]

Based on Sunset's high percentage of alcohol-based revenue, and based on the presence of live entertainment on Sunset's premises, Mr. Dant determined that Sunset faced risks and liabilities that were greater than those typically faced by other persons or businesses. He accordingly contacted J.M. Wilson Corporation ("J.M. Wilson"), which is a managing general agent that receives insurance coverage requests from such relatively high-risk entities. [Dkt. 62-6 at 3-4 (Sandra Fritz Dep., April 16, 2015).] J.M. Wilson, in turn, contacted Nautilus in order to obtain a quote for Sunset's requested coverage. [Dkt. 61-1 at 8-9.]

Nautilus reviewed Sunset's application for insurance and considered factors such as the nature of Sunset's business and the percentage of alcohol-based revenue in order to determine the price at which Nautilus would offer Sunset an insurance policy. [*Id.* at 11-13.] Nautilus then prepared a quote and included a range of different rates for different types of coverage. [*See* Dkt. 56-3 at 12-13.] As is relevant here, Nautilus indicated that it could provide a policy that would include both "liquor liability coverage" and "assault and battery" coverage. [*Id.* at 12.] Mr. Dant

then received these quotes, relayed them to Sunset, and discussed them with Sunset's owners. [*Id.*]

Sunset's owners then decided on the scope of coverage to purchase. [*See id.*; *see also* Dkt. 60-1 at 3.] Mr. Dant testified, [Dkt. 56-3 at 12], and John Logan agreed, [Dkt. 56-2 at 25; Dkt. 60-1 at 3], that Sunset decided to forgo complete "liquor liability coverage" because this coverage was too expensive. Mr. Dant also testified that Sunset decided to forgo "assault and battery" coverage because this coverage was also considered too expensive. [Dkt. 56-3 at 12.] Mr. Logan, however, disagreed: he testified that he could not recall discussing "assault and battery" coverage with Mr. Dant, [Dkt. 56-2 at 12], and he submitted an affidavit indicating that he believed he purchased coverage that included liability arising from "assault and battery" incidents. [Dkt. 60-1 at 3.]

Regardless of this disagreement, Sunset ultimately purchased a general commercial liability insurance policy from Nautilus. The period of coverage began in November 2009, and Sunset renewed the policy for several years. [Dkt. 60 at 3.]

The parties agree that the policy was in effect on April 27, 2012. [*See* Dkt. 56 at 2-3; Dkt. 60 at 4.] On that date, Andre Holt ("Holt") was shot in the face while in the Sunset parking lot. [Dkt. 56 at 1.] Approximately two years later, Holt filed suit against Sunset in Marion County Superior Court, alleging that Sunset had negligently failed to ensure that its premises were safe for its patrons. [*See* Dkt. 1-1 (State Court Complaint).]

Shortly after the shooting, Sunset's owners contacted Mr. Dant and provided details of the incident. [Dkt 60-1.] Mr. Dant did not indicate that a claim resulting from the incident would not be covered by Sunset's insurance policy, [*see id.*], but Nautilus ultimately denied coverage for Holt's lawsuit. [*See* Dkt. 60 at 5.] Nautilus then filed the current declaratory judgment action

4

against Sunset and Holt (collectively "Defendants"), seeking confirmation that Nautilus owes no duty to defend or indemnify Sunset for Holt's state court claims. [Dkt. 1.]

The insurance policy at issue includes three general areas of coverage: "Coverage A" includes coverage for "bodily injury" and "property damage" [Dkt. 1-2 at 9]; "Coverage B" includes coverage for "personal and advertising injury" [*id.* at 13]; and "Coverage C" includes coverage for certain medical payments. [*Id.* at 15.] The policy, however, also contains numerous exclusions. First, the policy's "Assault or Battery" exclusion provides as follows:

> Regardless of culpability or intent of any person, this insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of any:
>
>> 1. Actual or alleged assault or battery;
>> 2. Physical altercation; or
>> 3. Any act or omission in connection with the prevention or suppression of such acts, including the alleged failure to provide adequate security.
>> . . .
>
> This exclusion applies to:
>
>> 1. All causes of action arising out of any assault or battery, or out of a physical altercation including, but not limited to, allegations of negligent hiring, placement, training, or supervision, or to any act, error, or omission relating to such an assault or battery, or physical altercation;
>>
>> 2. Any claims or "suits" brought by any other person, firm or organization asserting rights derived from, contingent upon, or arising out of an assault or battery, or a physical altercation[.]
>> . . .
>
> [Nautilus] will have no duty to defend or indemnify any insured in any action or proceeding alleging damages arising out of any assault or battery, or physical altercation.

[Dkt. 1-2 at 31.] The policy then includes a separate exclusion for "Weapons":

> This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of: 1. The disposal, distribution, importation, maintenance, manufacture, marketing, ownership, packaging, repair, sale, storage, or use of any "weapon."
> . . .

> Weapons include, but are not limited to: 1. Firearms as defined in the Gun Control Act . . . including, but not limited to, any pistol, revolver, shotgun, rifle, [or] machine gun[.]

[Dkt. 1-2 at 38.] Plaintiff argues that the "Assault or Battery" and "Weapons" exclusions bar coverage for Holt's state law claims against Sunset, [*see* Dkt. 56], but Defendants assert that additional exclusions are also relevant to Plaintiff's current motion. First, the policy includes a "Participants" exclusion, which provides as follows:

> EXCLUSION – PARTICIPANTS
> . . .
> This insurance does not apply to bodily injury", "personal and advertising injury" or medical payments arising out of injury to any "participant" while in the "activity area".
> This exclusion applies to any resulting injury whether such injury occurs before, during, or after an "event" shown in the Schedule.
> . . .
> "Activity area" means the location where the "event" occurs including, but not limited to, the arena, chute, corral, course, field, infield, pit, ring, sideline, stage, track, or any site specifically set aside for the purpose of preparing for participation or assembly before, during or after any "event".
> . . .
> "Event" means any activity of an entertainment, athletic or sports nature of limited duration including, but not limited to, a carnival, circus, concert, "contact sport", contest, demonstration, exhibition, fair, match, parade, race, rodeo, show, stunting activity, or theatrical performance.
>
> "Participant" means any person practicing, preparing or rehearsing for, instructing, participating or sparring in, any "event" including, but not limited to, animal handlers, announcers, assistants, attendants, coaches, cheerleaders, clowns, contestants, "employees", entertainers, independent contractors, mechanics, musicians, officials, operators, participants, producers, promoters, referees, singers, speakers, sponsors, stage crews, stock contractors, "temporary workers", vendors or their "employees", "volunteer workers", or workers.

[Dkt. 1-2 at 45.] The policy also contains a "Total Liquor Liability" exclusion, which exempts from coverage any:

> "Bodily injury" or "property damage" for which any insured or his indemnitee may be held liable by reason of:
>
> (1) Causing or contributing to the intoxication of any person;

6

> (2) The furnishing of alcoholic beverages to a person under the legal
> drinking age or under the influence of alcohol; or
> (3) Any statute, ordinance or regulation relating to the sale, gift,
> distribution or use of alcoholic beverages.

[Dkt. 1-2 at 44.] Next, the policy contains an exclusion for "Injury to Employees,

Contractors, Volunteers and Workers":

> This insurance does not apply to . . . "Bodily injury" to: (1) An "employee" of any
> insured arising out of and in the course of: (a) Employment by any insured; or (b)
> Performing duties related to the conduct of any insured's business; or (2) The
> spouse, child, parent, brother or sister of that "employee" arising out of Paragraph
> (1) above.
> . . .
> "Employee" is any person or persons who provide services directly or indirectly
> to any insured . . . including, but not limited to, a "leased worker", a "temporary
> worker", a "volunteer worker", a statutory employee, a casual worker, a seasonal
> worker, a contractor, a subcontractor, an independent contractor, and any person
> or persons hired by, loaned to, employed by, or contracted by any insured or any
> insured's contractor, subcontractor, or independent contractor.

[Dkt. 1-2 at 30.] The policy then includes a separate "Contractors and Subcontractors"

exclusion:

> This insurance does not apply to "bodily injury", "property damage", "personal
> and advertising injury" or medical payments arising out of work performed by
> any contractor or subcontractor whether hired by or on behalf of any insured, or
> any acts or omissions in connection with the general supervision of such work.

[Dkt. 1-2 at 37.] Finally, the policy includes a "Total Pollution" exclusion:

> EXCLUSION – TOTAL POLLUTION
> . . .
> This insurance does not apply to:
> f. Pollution (1) "Bodily injury" or "property damage" which would not have
> occurred in whole or in part but for the actual, alleged or threatened discharge,
> dispersal, seepage, migration, release or escape of "pollutants" at any time.
> . . .
> "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant
> including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste
> includes, but is not limited to, materials to be recycled, reconditioned or
> reclaimed.

[Dkt. 1-2 at 35.]

7

## III.     Discussion

Plaintiff asserts that the above-described "Assault or Battery" and "Weapons" exclusions are both applicable to Holt's state court cause of action against Sunset. [Dkt. 56.] Plaintiff notes that Holt's injury plainly arose from an assault and/or battery, insofar as Holt was shot in the face, and Plaintiff notes that Holt's injury plainly arose from use of a weapon, insofar as Holt was shot with a firearm. [*Id.*] Plaintiff thus contends that the "clear and unambiguous policy terms exclude coverage" for Holt's claims. [*Id.* at 15.]

Defendants do not dispute this analysis of the "Assault or Battery" and "Weapons" exclusions. They concede that these exclusions—if enforced as written—would bar coverage for Holt's state court cause of action, and they concede that these exclusions, in and of themselves, are not unenforceable. [Dkt. 62 at 25 ("Neither Holt nor Sunset Strip assert that Indiana generally prohibits Assault And Battery exclusions in general liability insurance policies. Nor do they assert that the Assault And Battery Exclusion in Sunset Strip's insurance policy is ambiguous or that the Exclusion would not serve to bar coverage for Holt's injury if the policy is enforced as written."); *see also id.* at 9 ("Holt concedes that based upon the facts relative to how his injury occurred, the Assault and Battery Exclusion and the Weapons Exclusion in the Nautilus policy apply.").]

Defendants nonetheless ask the Court to deny Plaintiff's motion for summary judgment and instead enter an order requiring Nautilus to extend coverage to Sunset. Defendants argue that the Nautilus policy as written contains so many coverage exclusions that—as a matter of Indiana law[1]—the policy provides only "illusory coverage." [Dkt. 60 at 1; Dkt. 62 at 2.] Defendants

---

[1] Where, as here, a district court sits in diversity, it applies the choice of law principles of the forum state to determine which substantive law governs the proceedings. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). The parties in this case do not dispute that Indiana law governs the interpretation of the insurance contract at issue, and the Court will not disturb that consensus. *See, e.g., Harter v. Iowa Grain Co.*, 220 F.3d 544,

therefore argue that the Court cannot enforce the policy as written; instead, the Court must—as a matter of Indiana law—enforce the policy in accordance with Sunset's "reasonable expectations" about the scope of the policy's coverage. [Dkt. 60 at 8; Dkt. 62 at 7.] Defendants then contend that Sunset's owners did in fact have a reasonable expectation that liabilities such as Holt's state court claims would be covered, such that the Court must enforce the Sunset policy in a way that covers Holt's lawsuit. [Dkt. 60 at 16; Dkt. 62 at 26.]

In reply, Plaintiff disputes both aspects of Defendants' arguments. Plaintiff first contends that the insurance policy at issue did not provide illusory coverage. [Dkt. 71 at 2.] Plaintiff then contends that—even if the coverage were illusory—Sunset did not have a reasonable expectation that Holt's claims would be covered, such that summary judgment in Plaintiff's favor would still be appropriate. [*Id.* at 10.]

**A.  Indiana Law of Illusory Coverage**

An insurance policy in Indiana offers "illusory" coverage if the policy is "basically valueless to the insured" because the insured would "not recover benefits under any reasonably expected set of circumstances." *Davidson v. Cincinnati Ins. Co.*, 572 N.E.2d 502, 507 (Ind. Ct. App. 1991). If the policy is illusory, a court will not enforce the policy as written; instead, the court must enforce the policy "to satisfy the reasonable expectations of the insured." *Id.* at 508; *see also Landis v. Am. Interinsurance Exch.*, 542 N.E.2d 1351, 1354 (Ind. Ct. App. 1989) ("Where an otherwise unambiguous insurance clause provides only illusory coverage when construed within the insurance contract in its entirety, the courts of this state will enforce the provision so as to give effect to the reasonable expectation of the insured.").

---

560 n.13 (7th Cir. 2000) (citation omitted) ("Where the parties agree on the law that governs a dispute, and there is at least a 'reasonable relation' between the dispute and the forum whose law has been selected by the parties, 'we will forego an independent analysis of the choice-of-law issue[.]'").

Defendants' illusory coverage argument thus requires a two-part analysis: The Court must first determine whether the policy is in fact illusory. If the policy is **not** illusory, then the unambiguous terms of the policy control, and Plaintiff is entitled to summary judgment on the basis of the "Assault or Battery" exclusion. If the policy **is** illusory, then the Court must then determine whether Sunset had a reasonable expectation that claims such as Holt's cause of action would be covered by the policy. If there exists a genuine issue of material fact regarding Sunset's reasonable belief, then the Court must deny Plaintiff's motion for summary judgment.

At step one of the analysis, the Court asks whether the policy would "pay benefits under any reasonably expected set of circumstances." *See Davidson*, 572 N.E.2d at 507; *see also Monticello Ins. Co. v. Mike's Speedway Lounge, Inc.*, 949 F. Supp. 694, 699 (S.D. Ind. 1996) (same). An insurer "cannot avoid an illusory coverage problem by simply conceiving of a single hypothetical situation to which coverage would apply," *Monticello*, 949 F. Supp. at 701, but as long the policy "covers a risk reasonably anticipated by the parties, it is not illusory." *Schwartz v. State Farm Mut. Auto. Ins. Co.*, 174 F.3d 875, 881 (7th Cir. 1999).

Indiana courts have phrased this inquiry as whether the hypothetical coverage is so "sufficiently remote [as] to be deemed illusory." *Monticello*, 949 F. Supp. at 701 (quoting *Meridian Mut. Ins. Co. v. Richie*, 540 N.E.2d 27, 30 (Ind.), *opinion vacated on reh'g*, 544 N.E.2d 488 (Ind. 1989)). This determination is a matter of degrees rather than absolutes. *See id.* In *Davidson*, for instance, the Indiana Court of Appeals determined that coverage would be denied in "*most* cases," such that the possibility of the insured recovering was "very remote." *Davidson*, 572 N.E.2d at 508 (emphasis original). The court accordingly concluded that—even if an argument **could** be made for coverage in **rare** circumstances—the policy was nonetheless illusory. *See id.*

10

If the Court reaches step two of the analysis, the Court asks whether the insured's reasonable expectations of coverage would include the claim at issue. This analysis accounts for factors such as whether the insured asked for specific types of coverage; whether the insurer represented that certain claims were covered; and whether the parties' insurance agents made any related representations. *See Barnes v. McCarty*, 893 N.E.2d 325, 329 (Ind. Ct. App. 2008). The Court may also consider the amount paid by the insured, *see Monticello*, 949 F. Supp. at 704, the nature of the insured's business, and the purpose for which the insured sought coverage. *See Argonaut Ins. Co. v. Jones*, 953 N.E.2d 608, 624 (Ind. Ct. App. 2011).

### B.  The Nautilus Insurance Policy

Defendants argue that, when considered in concert, the above-quoted coverage exclusions render the Nautilus insurance policy illusory because they would act to bar coverage for essentially all claims in all circumstances. [Dkt. 62 at 9; *see also* Dkt. 60 at 9.] Plaintiff disputes this contention and argues that Defendants have erroneously interpreted the exclusions by construing them more broadly than is reasonable. [Dkt. 71 at 2.] The Court is well-equipped to address the parties' dispute at this stage of the litigation, *see, e.g.*, *Automation By Design, Inc. v. Raybestos Products Co.*, 463 F.3d 749, 753 (7th Cir. 2006) ("Where, as here, the parties' dispute turns primarily on the interpretation of a written contract, disposition through summary judgment is particularly appropriate."), and the Court addresses each of the exclusions in turn.[2]

---

[2] Defendants suggest that a court considering whether coverage is illusory cannot consider the relevant exclusions in isolation. [*See, e.g.*, 60 at 8 (emphasis added) ("[T]he exclusions in Sunset Strip's policy . . . **if read and applied together**, exclude virtually all coverage under any reasonably expected set of circumstances.").] This argument is consistent with the approach adopted in cases such as *Meridian Mut. Ins. Co. v. Richie*, 540 N.E.2d 27, 29 (Ind. 1989), but the Court nonetheless finds it analytically helpful to consider the contract in this case on an exclusion-by-exclusion basis. In doing so, the Court does not imply that a finding of illusory coverage must be predicated on a single exclusion; to the contrary, the Court has considered the exclusions in concert, but the Court still finds that, as explained below, the Nautilus policy may cover numerous potential claims. *See infra* Part III.B.6.

### 1.   The Liquor Exclusion

Defendants first argue that the "Total Liquor Liability" exclusion would exclude coverage for most potential claims. They observe that—as noted above—up to 93% of Sunset's revenues come from liquor sales, and they argue that the liquor exclusion would bar any claim related to such sales. They therefore contend that the exclusion would cover the vast majority of claims from Sunset's patrons, such that the Nautilus policy is illusory. [*See* Dkt. 60 at 10; Dkt. 62 at 16.]

Defendants' argument overstates the breadth of the "Total Liquor Liability" exclusion. As an initial matter, the fact that 93% of Sunset's revenues came from liquor sales hardly establishes that 93% of claims from Sunset's patrons would be excluded. This is because nothing in the record establishes how Sunset's liquor sales were distributed amongst its patrons: a small fraction of Sunset's patrons, for example, could account for the majority of Sunset's liquor sales, such that a large percentage of Sunset's patrons would have no connection to Sunset's liquor sales at all. Indeed, Holt and Sunset both cite evidence indicating that, if a person only wanted to drink alcohol, that person would likely go to a tavern or bar, as opposed to patronizing a club (such as Sunset) that also offers nude dancing. [Dkt. 60 at 10; Dkt. 62 at 19.] It is therefore likely that many patrons at Sunset would choose not to drink, such that potential claims from those patrons would not be covered by the "Total Liquor Liability" exception.

Next, even assuming *arguendo* that Sunset's liquor sales were distributed amongst all its patrons, this fact would not establish that the liquor exclusion would bar these patrons' claims. This is so for two reasons: First, the fact that 93% of Sunset's revenues were from liquor sales obviously indicates that seven percent of Sunset's revenues came from other sources, such as the sale of food from Sunset's on-site kitchen. Hence, even if a patron at Sunset **had** been drinking

liquor, the Nautilus policy would still offer coverage for claims that the patron might assert for negligent or defective preparation of food.

Second, the language of the liquor exclusion—as noted above—excludes claims for "'[b]odily injury' or 'property damage' for which any insured or his indemnitee may be held liable by reason of: (1) Causing or contributing **to the intoxication of any person**[.]" [Dkt. 1-2 at 44 (emphasis added).] Sunset, however, may obviously furnish drinks to its patrons without those patrons becoming "intoxicated." Many patrons, for instance, may have only one or two alcoholic drinks during the course of the evening, such that those patrons never become "intoxicated" at all. *See, e.g.*, *First Nat. Bank of Chicago v. Material Serv. Corp.*, 597 F.2d 1110, 1119 (7th Cir. 1979) ("Hart had had only one drink and was not intoxicated."); *United States v. Bailin*, 736 F. Supp. 1479, 1486 (N.D. Ill. 1990) ("Although Baker drank two beers during the scope of the two to three hour interview, he was not drunk."); *Smith v. State*, 270 Ind. 479, 486, 386 N.E.2d 1193, 1197 (Ind. 1979) ("The evidence was that on that morning, appellant had only 2 or 3 beers and was not intoxicated."). These patrons would accordingly participate in Sunset's liquor sales without any person becoming "intoxicated," and so regardless of the liquor exclusion, the Nautilus policy would still offer coverage for those patrons' claims.[3]

---

[3]       Plaintiff suggests that Defendants might have relied on *Monticello Ins. Co. v. Mike's Speedway Lounge, Inc.*, 949 F. Supp. 694 (S.D. Ind. 1996), for the proposition that a liquor exclusion can render insurance coverage illusory. [Dkt. 56 at 12-13.] In that case, the insured business was a neighborhood tavern and the insurance contract contained an exclusion stating that it provided no coverage for claims "arising out of or in connection with the manufacturing, selling, distributing, serving or furnishing of any alcoholic beverages." *Id.* at 696. The court ultimately determined that the policy was illusory, *id.* at 702, and Plaintiff anticipated that Defendants would analogize that case to this one.
        Ultimately, however, Defendants appear to have eschewed any argument that the liquor exclusion in this case is analogous to the one at issue in *Monticello*. [*See* Dkts. 60 & 62.] This is likely because the exclusion in *Monticello* was much broader than the relevant exclusion in this case. In *Monticello*, the contract excluded all claims "arising out of or in connection with" the "selling, distribution, serving or furnishing" of "any" alcoholic beverage; here, in contrast, the exclusion applies only to claims due to "[c]ausing or contributing to the intoxication" of a person. As explained above, not every sale or distribution of alcohol will necessarily cause or even contribute to "intoxication," and so the exclusion in this case is much less restrictive than in *Monticello*. Indeed, the exclusion in this case appears to be a typical "dram shop exclusion," which, in and of itself, is not at all objectionable. *See Monticello*, 949 F. Supp. at 703 (noting that courts have "enforce[ed] dram shop exclusions to deny coverage to

Defendants next argue that—even if the liquor exclusion is not as broad as they assert—the liquor exclusion is still inappropriate because it forbids coverage for many claims that are related to a core aspect of Sunset's business. [*See* Dkt. 60 at 10 ("[I]t is extremely concerning that Nautilus sold a policy that provided no coverage for claims inevitability arising out of a large segment of Sunset Strip's business.").] Nautilus, the argument goes, knew that Sunset sold liquor, such that the inclusion of the liquor exclusion was a transparent attempt to avoid covering any claims that would likely arise. *See id.*

Defendants rely on the Indiana Supreme Court's decision in *American States Ins. Co. v. Kiger*, 662 N.E.2d 945 (Ind. 1996). The insurance company in that case sold a gas station policy that excluded coverage for claims "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants,'" where "pollutants" were defined to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at 948. The insurance company urged the Indiana Supreme Court to read the clause literally, but the court said that it was "particularly troubled" by such an interpretation, as this interpretation "makes it appear that Kiger was sold a policy that provided no coverage for a large segment of the gas station's business operations." *Id.* at 949. The court thus concluded that—in order to avoid "negat[ing] virtually all coverage"—the clause "cannot be read literally." *Id.* at 948.

Defendants ask the Court in this case to take account of similar considerations in interpreting the liquor exemption, but this reliance on *Kiger* is misplaced. As noted above, the

---

establishments in the business of furnishing alcoholic beverages"). Hence, even if the court in *Monticello* decided that the liquor exclusion in **that** case rendered the coverage illusory, the court's reasoning has little applicability to the dram shop exclusion at issue here.

liquor exclusion in this case is not nearly as broad as Defendants contend, such that the clause does not negate "virtually all" coverage in the same way that the clause did in *Kiger*.

In addition, the Indiana Supreme Court has recently retreated from the concerns that the court expressed in *Kiger*. In *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, the insured was a company that provided security alarm services. 909 N.E.2d 997, 1004 (Ind. 2009). The company then purchased an insurance policy that included an exclusion for "bodily injury 'arising out of any act, error or omission of the insured in rendering or failing to render telephone answering, alarm monitoring or similar services.'" *Id.* The plaintiff argued that this exclusion "rendere[d] the [insurance] policy illusory" because the exclusion would have "effectively excluded coverage of all [of the insured's] operations." *Id.* The Indiana Supreme Court rejected this argument: it noted that an "alarm service, like any business, can incur liability from everyday activities that are not unique to the business," such that even if the insurance policy contained an exclusion for alarm services, it was still "reasonable to obtain general liability coverage[.]" *Id.*

The same considerations apply here: although Sunset is in the business of selling liquor, it is still reasonable for Sunset to obtain "general liability coverage" for "activities that are not unique to [Sunset's] business." Hence, even if the Nautilus policy does include an exclusion for certain activities related to Sunset's business, that exclusion—just as in *Tri-Etch*—does not render the policy illusory.

Next, the parties' course of conduct in negotiating the purchase of the Nautilus policy reveals a significant flaw in Defendants' argument. As described above, Nautilus offered Sunset the opportunity to buy an insurance policy that would have included total coverage for liquor liability. Sunset, however, specifically declined to buy such a policy because Sunset considered such coverage to be too expensive. [Dkt. 56-3 at 12-13 (Dant Dep.) ("Specifically he indicated

they did not want that coverage because of the cost involved.”); Dkt. 60-1 at 3 (Aff. of John Logan) (“I informed Christopher Dant that Sunset Strip wanted coverage for any potential claims outside of Sunset Strip’s unwillingness to pay high rates for liquor liability coverage and disinterest in terrorism coverage.”).] Hence, the coverage exclusion for certain liquor-related liability in the policy that Sunset purchased was a **benefit** that Sunset specifically **sought**. The exclusion was not an attempt on the part of Nautilus to avoid coverage; instead, the exclusion was part of Sunset’s efforts to obtain **general** liability coverage without paying for certain **other** coverage that it deemed to be too costly. Sunset, in short, **wanted** its policy to include the liquor exclusion, and so it is now disingenuous for Sunset to challenge the **effect** of that exclusion.

Moreover, accepting Defendants’ argument on this issue would implicate serious policy concerns. Taken to its logical conclusion, Defendants’ position would allow an insured to 1) negotiate to buy a policy with many exclusions in order to avoid paying a high premium; and then 2) set up an illusory coverage argument to later force the insurer to provide coverage that ignores those exclusions. Defendants, that is, essentially ask the Court to order Nautilus to provide coverage for which Defendants made the explicit choice not to pay. Such judicial interference would undermine the parties’ generally recognized freedom to contract, *see, e.g.*, *Dewbrew v. Dewbrew*, 849 N.E.2d 636, 645 (Ind. Ct. App. 2006) (“Indiana’s public policy generally favors the freedom of contract between private parties.”), and such interference would come with necessarily pernicious implications for the financial viability of the insurance industry. The policy concerns at issue in this case thus confirm the Court’s conclusion that the liquor liability in the Nautilus policy is not amenable to an interpretation that renders the policy illusory.

### 2.   The Participant Exclusion

Defendants next turn to the "Participant" exclusion. As described above, this exclusion precludes coverage for injuries to "participants" that arise while the participant is in the "activity area." [Dkt. 1-2 at 45.] The "activity area" is the area where an "event" occurs, and an "event" is defined broadly enough to include the live entertainment that Sunset provides. [*See id.*] The policy then defines "participant" to mean "any person practicing, preparing or rehearsing for, instructing, participating or sparring in, any 'event' including, but not limited to, . . . 'employees', entertainers, independent contractors, . . . participants, producers, promoters, referees, singers, speakers, sponsors, stage crews, stock contractors, 'temporary workers', vendors or their 'employees', 'volunteer workers', or workers." [*Id.*]

Defendants contend that the definition of participant is so broad that any patron in the Sunset establishment may be deemed a "participant," such that an injury to any patron would fall within the "Participant" exclusion. [*See* Dkt. 60 at 10-11.] They note that—as described above— Sunset's dancers continuously attempt to attract the attention of Sunset's patrons, and that the dancers alter their behavior in response to whether the patrons are paying attention to the dancers. [*See id.*] They thus argue that each patron is at least indirectly participating in Sunset's entertainment, and they argue that the "Participant" exclusion therefore encompasses any claim asserted by such patrons. [*See id.*]

This argument rests on an unnaturally broad reading of the exclusion. The policy's definition of "participant" includes a lengthy list of types of persons who qualify as "participants," but the list does **not** include "patrons," "attendees," "invitees," "guests," "spectators," or similar terms. [*See* Dkt. 1-2 at 45.] Moreover, Indiana courts follow the doctrine of *expressio unius est exclusion*, and so "[w]hen certain persons or things are specified in a law,

contract, or will, an intention to exclude all others from its operation may be inferred." *Metro.*

*Dev. Comm'n of Marion Cnty. v. Villages, Inc.*, 464 N.E.2d 367, 369 n.2 (Ind. Ct. App. 1984).

Thus, if Nautilus had intended to include "patrons" among the sorts of people who may qualify

as participants, Nautilus likely would have done so, and the fact that Nautilus did **not** include

such language indicates that the "Participant" exclusion should **not** be read as broadly as

Defendants contend.

 To resist this conclusion, Defendants' invoke their own canon of construction: they note

that the Nautilus policy defines "participant" by using the words "participate" and "participant"

themselves. [Dkt. 60 at 11; *see also* Dkt. 1-2 at 45 (emphasis added) ("**Participant**" means any

person . . . **participating** or sparring in, any 'event' including, but not limited to, . . .

**participants** . . . or workers.").] The policy offers no further definition of the word "participate,"

and Defendants accordingly conclude—not unreasonably—that the definition is ambiguous.

[Dkt. 60 at 11.] Defendants then contend that, as a matter of Indiana law, an ambiguous

insurance policy must be "be construed in favor of the insured," such that the Court should

construe the "Participant" exclusion broadly in order to support Defendants' illusory coverage

claim. [*See id.* (citing *Monticello*, 949 F. Supp. at 699).]

 Defendants are correct that, in *Monticello*, the court did state that "ambiguous language

in an insurance contract must be construed in favor of the insured." 949 F. Supp. at 699.

Defendants, however, have removed this quotation from its context. The court in *Monticello*

made its observation only while noting that "**[e]xclusionary provisions** in insurance contracts

are subject to this principle," such that an "**exclusion** will be given effect only if it unmistakably

brings the act or omission within its scope." *Id.* (emphasis added) (quoting *Evans v. National Life*

*Accident Ins. Co.*, 467 N.E.2d 1216, 1219 (Ind. App. 1984). The quotation from *Monticello* thus

does not establish that an ambiguous insurance contract will always be interpreted in whatever manner happens to favor the insured's position; instead, the quotation establishes that **exclusions** in insurance policies will be interpreted narrowly.

This reading of *Monticello* is consistent with Indiana cases describing the interpretation of ambiguous insurance policy language. For example, the Indiana Court of Appeals in *American Family Life Assurance Co. v. Russell*, 700 N.E.2d 1174, 1177 (Ind. Ct. App. 1998), did acknowledge that a "strict construction against the insurer" is sometimes appropriate, but again, the court did so only in the context of construing **exclusions** to an insurance policy. *See id.* (emphasis added) ("The **exclusionary clause** must clearly and unmistakably bring within its scope the particular act or omission that will bring the exclusion into play[.]"). Indiana courts, in other words, favor interpretations that promote broad coverage. *See id.* (emphasis added) ("[A]ny doubts to the coverage under the policy shall be construed against the insurer to **further the policy's basic purpose of indemnity**."); *accord, e.g., Gen. Housewares Corp. v. Nat'l Sur. Corp.*, 741 N.E.2d 408, 415 (Ind. Ct. App. 2000) (emphasis added) ("Indiana courts **favor coverage** when interpreting ambiguities in insurance policies, particularly where a policy excludes coverage."); *Indiana Ins. Co. v. N. Vermillion Cmty. Sch. Corp.*, 665 N.E.2d 630, 635 (Ind. Ct. App. 1996) (emphasis added) ("Any ambiguity generated by the policy language is to be construed against the insurer and **in favor of coverage for the insured**.").

Moreover, Indiana courts adhere to this preference for narrow constructions of coverage exclusions even when the insured asserts an illusory coverage argument. In *Schwartz v. State Farm Mutual Auto. Ins. Co.*, the plaintiffs argued that their underinsured motor vehicle policy was illusory, and as part of that argument, they maintained that one section of the policy should

be construed narrowly. 174 F.3d 875, 879-80 (7th Cir. 1999). Applying Indiana law, the Seventh

Circuit rejected this argument:

> [Plaintiffs] insist that this section excludes coverage. . . . Although [they] concede
> that this is an unlikely reading of the policy language, they insist that any
> ambiguity in an insurance contract must be construed against the insurer. We
> cannot accept this argument. . . . **[T]he plaintiffs' ambiguity argument actually
> cuts the other way. To the extent the wording of the section is ambiguous, it
> must be interpreted not just against the insurer but in favor of coverage**.
> Thus if the [plaintiffs] were to bring a claim under section 2b seeking recovery in
> the hypothetical situation described above, a court would interpret its ambiguity
> against the insurer and in favor of coverage. Thus the risk described would almost
> certainly result in payment of benefits. Because the underinsured provision covers
> a risk reasonably anticipated by the parties, it is not illusory, and the claim was
> properly denied.

*Id.* at 880-81 (emphasis added) (citations omitted). If anything, then, the canon of construction

that Defendants invoke in this case—just as in *Schwartz*—actually works to Defendants'

disadvantage. The "Participants" clause in the Nautilus policy is an exclusionary clause, and so

the Court must interpret that clause "in favor of coverage for the insured." *See Indiana Ins. Co.*,

665 N.E.2d at 635; *accord* Schwartz, 174 F.3d at 880-81. This canon therefore strengthens the

Court's conclusion that Defendants' reading of the clause is overly broad, and this, in turn,

makes it unlikely that the "Participants" exception would cover nearly as many claims as

Defendants assert.

  In addition, Defendants' reading of the Participants exclusion ignores the exclusion's

limitation to the "activity area." [*See* Dkt. 1-2 at 45 (emphasis added) ("This insurance does not

apply to [claims] arising out of injury to any 'participant' **while in the 'activity area.'**"). The

policy defines the "activity area" as the area where Sunset's entertainment occurs, "including,

but not limited to, the arena, chute, corral, course, field, infield, pit, ring, sideline, stage, track, or

any site specifically set aside for the purpose of preparing for participation or assembly before,

during or after any 'event'." [*Id.*] This definition is admittedly lengthy, but as applied to Sunset's

business, the only relevant terms are "stage" and "site specifically set aside for the purpose" of Sunset's entertainment. These terms plainly would not apply to areas such as Sunset's bar or parking lot, and so the exclusion would have no bearing on claims arising from injuries that patrons sustain in these areas. Again, then, the "Participants" exclusion is not nearly as broad as Defendants' assert, and this exclusion—even when considered in combination with the policy's other exclusions—does not render the Nautilus policy illusory.

### 3.  The Contractors and Subcontractors Exclusion

In its brief in support of its motion for summary judgment, Plaintiff argues that the Nautilus policy was not illusory because it would cover, *inter alia*, claims resulting from patrons "slipping on ice" or "being hit by a falling light fixture." [Dkt. 56 at 14.] Defendants dispute this conclusion on the grounds that the policy's "Contractors and Subcontractors" exclusion would bar such claims. [Dkt. 60 at 12.]

As described above, this exclusion bars claims "arising out of work performed by any contractor or subcontractor whether hired by or on behalf of any insured, or any acts or omissions in connection with the general supervision of such work." [Dkt. 1-2 at 37.] Defendants then note that Sunset's owners and employees do not "remove any snow or ice" and do not "repair or install any fixtures, structural or major cosmetic issues with the property;" instead, "contractors are hired to complete this work." [Dkt. 60 at 12 (citing Dkt 60-1 at 4 (Aff. of John Logan)).] Defendants thus assert that a contactor would be hired to remove any ice on which a patron might slip and that a contractor would be hired to install any light fixture that might fall. [*Id.*] They accordingly claim that the injuries from Plaintiff's hypothetical would "aris[e] out of work performed by [a] contractor," such that the "Contractors and Subcontractors" exclusion would preclude coverage for the injuries. [*See id.*]

The Court again finds Defendants' interpretation of the policy's exclusions to be overly broad. The "Contractors and Subcontractors" exclusion applies only to injuries "arising out of work" performed by the contractor, and Indiana courts in other contexts have construed such language in insurance contracts relatively narrowly. *Cf., e.g.*, *Liberty Mut. Ins. Co. v. Michigan Mut. Ins. Co.*, 891 N.E.2d 99, 103 n.2 (Ind. Ct. App. 2008) ("In a different context, Indiana courts have defined the phrase 'arising out of' (a phrase used in the additional-insured endorsement here) to mean the efficient and predominating cause."); *Shelter Mut. Ins. Co. v. Barron*, 615 N.E.2d 503, 506 (Ind. Ct. App. 1993) ("[T]his court has also followed the more narrow construction of the phrase 'arising out of the ownership, maintenance or use.'"). Thus, even if Sunset does use contractors to perform certain work, the Court finds it unlikely that all injuries even tangentially related to such work would fall within the scope of the inclusion: if, for instance, Sunset hires a contractor to install a new light fixture and the fixture falls at some remote time, well after the work is completed, an injury related to the fall likely would not "aris[e] out of" work performed by the contractor.

This is especially likely if the fall results not from any action on the part of the contractor but instead—as an example—from Sunset's own negligence in maintaining the fixture after the contractor's work is completed. In such a case, the "efficient and predominating cause" of the accident would be Sunset's omissions—rather than the contractor's work—such that the accident likely would not "arise" from the contractor's activities. *See Liberty Mut. Ins. Co.*, 891 N.E.2d at 103 n.2.

Additionally, even if the Court construed the term "arising out of" more broadly, this interpretation would have little bearing on whether the Nautilus policy is illusory. Sunset's owner himself acknowledged that Sunset employs several managers, servers, bartenders, and

bouncers, [Dkt. 60-1 at 1], and so the work performed on Sunset's premises obviously is not performed exclusively by contractors or subcontractors. Any injury that a patron sustains as a result of one of those employee's activities would thus fall outside the scope of "Contractors and Subcontractors" exclusion, such that the Nautilus policy would in fact cover certain claims.

### 4. Total Pollution Exclusion

Defendants next note that Plaintiff's Rule 30(b)(6) deposition witness stated that the Nautilus policy would cover "the use of pyrotechnics leading to a fire and injuries resulting from patrons attempting to avoid the fire." [Dkt. 60 at 13.] Defendants argue that this assertion is incorrect because the "Total Pollution" exclusion would bar such coverage. [*Id.*; *see also* Dkt. 62 at 22.]

The pollution exclusion states that the Nautilus policy does not apply to claims that "would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants,'" where "pollutants" means "any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." [Dkt. 1-2 at 35.] Defendants contend that the fire from Plaintiff's hypothetical would constitute a "thermal irritant," such that any claims resulting from the fire would fall within the scope of the pollution exclusion. [Dkt. 60 at 13.] Nautilus disputes this conclusion in its reply. It contends that it is a "stretch" to treat fire as a "pollutant" or to call fire a "thermal irritant," and it asserts that "[i]njuries related to fire . . . may be significant and in many circumstances would be covered." [Dkt. 71 at 7.]

Neither party offers any case law in support of its analysis of whether fire constitutes a "thermal irritant," [*see* Dkt. 60 at 13; Dkt. 62 at 22; Dkt. 71 at 7], nor has the Court been able to locate any Indiana case directly on point. As described above, however, Indiana law directs a

Court to narrowly interpret ambiguous exclusions in insurance contracts, *see, e.g.*, *Gen. Housewares*, 741 N.E.2d at 415, and Indiana courts subscribe to the canon of *expressio unius est exclusion*. *See Metro. Dev. Comm'n*, 464 N.E.2d at 369 n.2.

Here, the pollution exclusion specifically describes claims related to "smoke," "vapor," "soot," and "fumes." [Dkt. 1-2 at 35.] Notably absent from that list is any reference to "flames" or "fire," and it thus appears that the exclusion was not intended to cover claims related to such damage. *See Metro. Dev. Comm'n*, 464 N.E.2d at 369 n.2. Thus, to the extent that the pollution exclusion is ambiguous, the Court construes the clause narrowly, *see Gen. Housewares*, 741 N.E.2d at 415, and the Court finds that claims caused by fire or flames likely would be covered by the Nautilus policy.

In addition, whether fire-based claims are covered has little bearing on the final determination of whether the Nautilus policy is illusory. As explained above, many of the other exclusions on which Defendants rely are not as broad as Defendants assert; and as explained below, *see infra* Part III.B.6, many claims unrelated to fire or flames would likely be covered by the policy. Hence, whether the policy also covers a narrow class of claims related to fire damage is ultimately not dispositive of the Court's determination of whether the coverage afforded by the Nautilus policy is illusory.

### 5. Illusory Coverage as a Matter of Degree

Defendant Sunset finally argues that the Court should find that, "as a matter of degree," the Nautilus policy provided only illusory coverage. [Dkt. 60 at 14.] This argument rests on the court's statement in *Monticello* that "illusory coverage is a matter of degree, not absolutes." 949 F. Supp. at 701. Sunset interprets this language as an invitation to consider 1) the magnitude of the premiums that the insured paid and 2) whether the amount of the premium was reasonable in

comparison to the scope of the coverage obtained. [*See* Dkt. 60 at 15.] Sunset then contends that Nautilus charged "excessive premiums," [*id.*], with the apparent implication that—even if numerous claims **are** in fact covered by the policy—the Court should nonetheless deem the policy's coverage to be "illusory" in relation to amount that Sunset paid.

Sunset misreads the court's decision in *Monticello*. The court in that case mentioned the "degree" issue only in support of its contention that "an insurer cannot avoid an illusory coverage problem by simply conceiving of a single hypothetical situation to which coverage would apply." 949 F. Supp. at 701. The question of illusory coverage, in other words, is not binary: it is not a matter of covering no claims (illusory) or covering at least one claim (not illusory). Thus, the question of illusory coverage is a matter of "degree" insofar as conceiving of a single covered claim is not an "absolute" bar to a finding of illusory coverage.

The court in *Monticello*, however, said nothing about considering the cost of coverage at this stage of the analysis. Instead, the court deferred the question of cost to the second stage of the illusory coverage analysis—i.e., determining whether the insured had a reasonable expectation of coverage. *See Monticello*, 949 F. Supp. at 704 ("[Defendant] paid $910 annually for commercial general liability coverage. . . . [Defendant] has raised a genuine issue of material fact on the question of its reasonable expectation of coverage.").

In this case, then, whether Sunset paid a particularly high premium is relevant to whether Sunset had a reasonable expectation of coverage, but such payments are not relevant to whether the Nautilus policy was illusory in the first place. At the first stage of the analysis, that is, the Court essentially considers the degree of coverage in a vacuum: is the degree of coverage so slight that the payment of benefits through the policy is very unlikely? If so, then the policy provides illusory coverage, and the Court may then consider whether the price of the policy gave

the insured a reasonable expectation of coverage for the claim at issue. *See Monticello*, 949 F. Supp. at 704. Otherwise, however, the terms of the policy are controlling, and the Court will enforce those terms regardless of whether one party now considers the price to be unfair. *See, e.g.*, *Bogigian v. Bogigian*, 551 N.E.2d 1149, 1153 (Ind. Ct. App. 1990) (citation omitted) ("The freedom to contract includes the freedom to contract improvidently[.]"). Ultimately, then, Sunset's argument about the "degree" of coverage conflates the two steps of the illusory coverage analysis, and Sunset's argument on this issue does not provide a basis for denying Plaintiff's motion for summary judgment.

### 6.  Potentially Covered Claims

As noted above, conceiving of a single hypothetical in which coverage might be extended is not sufficient to establish that an insurance policy is not illusory. *See Monticello*, 949 F. Supp. at 701. In its reply, however, Plaintiff provided numerous examples of claims that would potentially be covered under the Nautilus policy. [*See* Dkt. 71.] These claims include "trips and falls," "spilled drinks on customers," "glass in a drink," and "food poisoning." [*Id.* at 5.] The Court then granted Sunset leave to file a surreply to address whether such claims would be covered. [Dkt. 74.]

With respect to "trips and falls," Sunset's surreply reiterated the argument that it advanced in its response in opposition to Plaintiff's motion. [*See* Dkt. 75 at 6 & n.2.] Sunset thus argues that such claims are not covered because any Sunset patron is actually a "participant" within the meaning of the "Participant" exclusion. [*See* Dkt. 60 at 11.] As explained above, however, this exclusion is not as broad as Sunset maintains, and so a claim arising from a trip-and-fall near Sunset's bar or in Sunset's parking lot would likely be covered. Sunset also argues that the cause of the trip-and-fall in question could be a contractor's negligent performance of his

26

work, such that coverage would be precluded by the "Contractor or Subcontractor" exclusion. [*See* Dkt. 60 at 12.] As explained above, however, this exclusion is narrower than Sunset contends, and Sunset itself acknowledges that its bartenders, bouncers, managers, and servers are employees rather than contractors. Any of these employees could inadvertently trip a patron or otherwise cause a trip-and-fall, such that the "Contractor or Subcontractor" exclusion would be inapplicable.

With respect to "spilled drinks on customers" and "food poisoning," Sunset implicitly concedes that such claims are covered, but Sunset argues that the damages arising from such claims would not approach the Nautilus policy's $1,000 per-claim deductible. [Dkt. 75 at 5-6.] Sunset thus contends that it would always find it more economical to pay the claim than to pay the deductible, such that the policy would never provide coverage for such claims. [*See id.*]

This argument ignores the fact that damages from such claims can easily exceed $1,000 dollars. *See, e.g.*, *Travelers Prop. Cas. Co. of Am. v. RSUI Indem. Co.*, 844 F. Supp. 2d 933, 934 (N.D. Ill. 2012) (single occurrence of food poisoning settled for $3 million after *E. coli* contamination caused wrongful death); *Muzzarelli v. Landry's Restaurants, Inc.*, No. 02 C 7622, 2003 WL 1720065, at *1 (N.D. Ill. Mar. 31, 2003) (damages in food poisoning claim exceeded amount-in-controversy requirement for diversity jurisdiction); *Mason v. Home Ins. Co. of Illinois*, 532 N.E.2d 526, 531 (Ill. 1988) ($1 million policy limit did not apply to claims arising from botulism contamination). Hence, even if some claims that Plaintiff described in this case might not reach the Nautilus policy's $1,000 deductible, other claims certainly could satisfy the $1,000 threshold, and coverage for such claims could reasonably be expected to arise.

Sunset then contends that a claim such as "glass in a drink" is the sort of "outlandish" scenario that is insufficient to defeat a claim of illusory coverage. [Dkt. 75 at 6.] As this Court

27

well knows, however, such a claim is not at all implausible. *See* Complaint ¶ 17, *Lively v. Logan's Roadhouse, Inc.*, No. 1:14-cv-01330-JMS-MJD (S.D. Ind., Aug. 13 2014), ECF No. 1-1 ("While eating a salad provided and prepared by Logan's [plaintiff] ingested shards of glass that were allowed to be present in the salad that had been served to her."). In addition, claims related to foreign objects in food or drink are a staple of the law of negligence. *See, e.g.*, *Kroger Co. v. Beck*, 375 N.E.2d 640, 643 & n.1 (Ind. Ct. App. 1978) (collecting cases in which glass, metal, and other objects resulted in negligence actions). Thus, even if such claims are not especially frequent, the claims are not so "outlandish" that they cannot reasonably be expected to occur.

Based on this analysis, the Court agrees with Plaintiff that claims such as "trips and falls," "spilled drinks on customers," "glass in a drink," and "food poisoning" would be covered by the Nautilus policy, and that—regardless of Sunset's argument about the policy's deductible—these claims would reasonably be expected to result in coverage.  As such, the Nautilus policy is not illusory. *See, e.g.*, *Schwartz v. State Farm Mut. Auto. Ins. Co.*, 174 F.3d 875, 881 (7th Cir. 1999) ("Because the underinsured provision covers a risk reasonably anticipated by the parties, it is not illusory.").

Moreover, Plaintiff identified additional claims that would potentially be covered. In particular, the "Coverage B" portion of the Nautilus policy provides coverage for claims such as "false arrest, malicious prosecution, libel, slander, use of another's advertising idea, and copyright, trade dress or slogan infringement." [Dkt. 71 at 5; Dkt. 1-2 at 13-15.] Coverage B does contain certain exclusions on such claims, but the policy also includes limitations on these exclusions. Thus, as an example, the policy specifically covers copyright and trade dress infringement claims that arise from Sunset's advertising activities. [Dkt. 1-2 at 14.] This

28

coverage, in turn, indicates that the insurance policy that Sunset obtained was not as limited as Sunset now alleges, such that the coverage was not illusory.

In its surreply, Sunset argues that the Court should ignore the claims encompassed by Coverage B. [Dkt. 75 at 1-3.] Sunset maintains that the "claims in the underlying case only pertain to Coverage A," such that the Court "should only analyze whether Coverage A is illusory and ignore any analysis pertaining to Coverage B in the policy." [*Id.* at 2.]

Sunset's argument proves too much, as accepting this argument would allow **any** insured who has been denied coverage to prevail on an illusory coverage claim by drawing arbitrary lines in the insured's policy. The insured, that is, could always argue that the relevant "claims in the underlying case only pertain to" a specific coverage provision, such that the Court "should only analyze whether [that specific provision] is illusory and ignore any analysis pertaining to [other provisions.]" By hypothesis, however, the insurer would have already determined that the claim at issue was **not** covered by the specific provision, such that the Court would necessarily conclude that coverage would not exist. This would automatically render that provision illusory, and Sunset's argument would thus effectively allow **any** insured to negate the effect of **any** coverage exclusion simply by ignoring the context of that exclusion in the insurance policy as a whole. The Court cannot such a broad argument, and the Court thus finds it appropriate to consider the effect of Coverage B.[4]

---

[4] Sunset's surreply also reiterates its argument that the Court should find that the Nautilus policy is illusory as a "matter of degree" because Nautilus allegedly charged a premium that was too high for the coverage provided. [Dkt. 75 at 6-7.] Sunset notes that it paid $136,624 in premiums, [*id.* at 7], and a portion of these payments were obviously consideration for Coverage B. Sunset, however, does not differentiate between the amounts paid for Coverage A and the amounts paid for Coverage B. [*See id.*] Hence, even if the Court were inclined to accept Sunset's argument about the degree of coverage, *but see supra* Part III.5, the Court would **have** to consider the effect of Coverage B in determining whether the total premium that Sunset paid was actually excessive in relation to the total coverage that Nautilus provided. Sunset's own argument thus provides another reason why the Court cannot consider Coverage A in isolation.

In addition, the Court has already determined that, based upon coverage for incidents such as "trips and falls," "spilled drinks on customers," "glass in a drink," and "food poisoning," the Nautilus policy is not illusory. If anything, then, Coverage B merely confirms the Court's prior analysis, and so even if the Court accepted Plaintiff's argument regarding Coverage B, that argument would not change the result in this case. Again, then, the Nautilus policy would in fact provide coverage for a variety of potential claims, any of which could reasonably be expected to occur in an establishment such as Sunset. The Nautilus policy therefore is not illusory. *See, e.g.*, *Schwartz*, 174 F.3d at 881.

### C.  Sunset's Reasonable Expectations

As noted above, a factual dispute exists as to whether Sunset's owners had a reasonable expectation that their insurance policy covered Holt's claims. [*Compare* Dkt. 56-3 at 12 (testimony that Sunset had decided to forgo assault and battery coverage)*, with* Dkt. 60-1 (testimony that Sunset's owner believed he had purchased assault and battery coverage).] The insured's reasonable expectations, however, are relevant only if the insurance contract does in fact provide illusory coverage; otherwise, the plain language of the insurance contract is controlling. *Cf. Landis v. Am. Interinsurance Exch.*, 542 N.E.2d 1351, 1354 (Ind. Ct. App. 1989); *see also Spencer v. Bridgewater*, 757 N.E.2d 208, 211 (Ind. Ct. App. 2001) ("If the insurance policy language is clear and unambiguous, courts give to that language its plain and ordinary meaning and enforce the contract according to its terms.").

Here, the Nautilus policy is not illusory, and any factual dispute about Sunset's reasonable expectations is accordingly irrelevant. In addition, Defendants in this case concede that the clear and unambiguous terms of the Nautilus policy bar coverage for claims arising from the injury Holt suffered. [Dkt. 62 at 9 ("Holt concedes that based upon the facts relative to how

30

his injury occurred, the Assault and Battery Exclusion and the Weapons Exclusion in the

Nautilus policy apply.").] The Court accordingly gives effect to that language, and the Court

therefore **GRANTS** Plaintiff's motion for summary judgment.

### IV.    Conclusion

For the reasons explained above, the Court **GRANTS** Plaintiff's motion for summary

judgment. [Dkt. 55.] Final judgment will issue by separate order.

Date:  07/28/2015

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Teresa L. Todd
territodd@sbcglobal.net

Michael Wesley McBride
COHEN & MALAD LLP
mmcbride@cohenandmalad.com

Richard M. Malad
COHEN & MALAD LLP
rmalad@cohenandmalad.com

Scott B. Cockrum
HINSHAW & CULBERTSON
scockrum@hinshawlaw.com

Jason A. Shartzer
SHARTZER LAW FIRM LLC
jshartzer@shartzerlaw.com